Good morning. May it please the court? Mr. Riley? I'm Patrick Deaton. I represent Casey Peebles. I'm here today representing appellant who's asking this court to set aside his two drug convictions after a jury trial and enter judgments of acquittal based on insufficiency of the evidence or in the alternative for relief to order a new trial as a result of four evidentiary rulings that the trial court made. I'd like to begin with the first issue in appellant's brief having to do with federal rule of evidence 801 D2E involving the so Casey Peebles' conviction depended on the testimony of Quante Harris, a co-defendant in this case. He was a member of the Randers conspiracy to distribute drugs in St. Louis. He wasn't a family member, but most of the people in the conspiracy were members of the Randers family in one way or another. The central events in the case have to do with Casey Peebles' arrest on the night of April 2nd, 2013 here in the city of St. Louis. Prior to April 2nd that night, Quante Harris had on the night of April 2nd. And this allowed Quante Harris to testify about matters that Joseph Rander told Quante Harris. Joseph Rander never testified at the trial. And why this is so important is because without Joseph Rander, without, I'm sorry, without what Quante Harris claims to have learned from Joseph Rander, there isn't sufficient evidence to convict Casey Peebles on the conspiracy count. What about the, well maybe you're going to answer that the conspiracy is different, but there was testimony that he was seen, Mr. Rander, at a particular time, came back out, there was a traffic stop, there were drugs that were ultimately linked to him. So is that enough to link him to the conspiracy if there's sufficient evidence to show the jury that he actually purchased drugs from that location or was fronted drugs? No. For this reason, I'm going to assume that you're, assume your facts for purposes of the question, if he had gone there to obtain drugs, which he denied, he testified in this case and said that wasn't why I was there, that wouldn't put him in a conspiracy. That could simply be a buyer-seller relationship. And the, what Joseph, what Quante Harris testified about what Joseph Rander said, those events weren't in furtherance of the conspiracy. Quante Harris said that Joseph Rander told him after Casey Peebles had left that I, Joseph Rander, sold him nine ounces of heroin. That, and it's our contention that the judge didn't properly apply the test for 8012. So are you saying that that's, that the statements themselves are the only evidence of the conspiracy? The disputed statements from Mr. Rander are the only evidence of a conspiracy with involving Peebles? Well, the fact, the fact that he's there, mere presence doesn't convict him of a conspiracy. The fact that he's at that house and the courts require evidence in just what you're asking about, independent evidence, evidence that's independent of the statements themselves to establish the existence of the conspiracy. And in this case, the law enforcement first started investigating this case at least as early as the fall of 2011. From the fall of 2011 until April 2nd of 2013, despite use of informants, pin registers, trap and trace devices, surveillance, the officers had no idea that Casey Peebles had anything to do with the Randers. So if this was a case where Casey Peebles had been seen at that address before or his phone number had shown up in a pin register or with a trap and trace device, that would be a different story. But the evidence of this conspiracy in this case comes from what Quante Harris claims to have learned from Joseph Rander. If there were, if there were, if the record established independent evidence to support the conspiracy, Peebles' involvement in the conspiracy, would you concede that those, that the statements made by Rander were statements in furtherance of that conspiracy? No. Assuming that the conspiracy has been properly established for purposes of the evidentiary rule. No, I wouldn't, I wouldn't concede that. Why is that? Why would that not be a statement in furtherance of the conspiracy? Well, what Quante Harris said about what Joseph Rander said, that was just historical. The, the transaction had already occurred. It was over. It didn't advance, didn't advance the conspiracy in any way. So is there evidence put on as to the meaning of twins people coming through, what that phrase means or what the language used by or quoted by Harris attributed to Rander as to what those phrases meant in the drug trade or in furtherance of the conspiracy? Just, if I understand your question correctly, I thought his, his, Mr. Harris's statements about what Rander said were pretty clear. And he, he, he named an amount, he named an amount, nine ounces, and he, and he said heroin. Did I misunderstand your question? Just proceed. I think that, that, that where I'm having a little bit of trouble with that particular testimony is that I understand that Mr. Harris said that, he said twin people, be fitting to come through, we'd be, we fit in to be on, we fit in to be back together. And that talks about a relationship of some kind, which put in context, as it all kind of fits together, may infer some relationship, tying in people's to some other ongoing relationship. Is that, is that not what he was saying? Was he saying something different? Was there something else going on there? Um, Judge, I, I, um, uh, um, my answer is no. The, the quote, uh, one of twins people is coming, we, we fit in to be on again, something like that. Okay. Well, that doesn't say Casey Peebles. Okay. And there was no explanation in this trial of who twin was or who twins people were. There, there was no connection of, of Casey Peebles to twin or that he was one of, uh, that, uh, that Casey Peebles was one of twins people. They, they'd been investigating this group for a long time and there was no evidence of that. You mentioned as well that, uh, uh, at most it might look at, look like a, uh, a buyer seller relationship. Um, and, uh, does it, is it legally significant that there is a deliverable quantity of drugs that's discovered in the, uh, ultimate search and arrest? Um, well, on the, uh, on the second count, uh, Mr. Peebles was convicted of possession with the intent to distribute and the, uh, and the amount of heroin, uh, was more than a personal use, was more than a personal use amount. Um, but, um, what I wanted to tell the court about that is, um, I'm not an economist, but even though drugs are expensive, it doesn't mean they're scarce. Uh, uh, so nine ounces of heroin, the street price of that, according to testimony at trial, uh, would be maybe around $20,000, but that doesn't mean that heroin was so scarce that it was unlikely that this heroin could have come from somewhere else if it didn't come, uh, from the apartment, uh, that the Randers had been using to distribute drugs. I, uh, want to talk about the, uh, issue of allowing a veteran police officer to testify as an expert on drug trafficking. I realized that the admission of evidence, uh, that is, um, well, the standard to review is abuse of discretion. Um, but appellant's argument is that the judge abused his discretion in this particular case by not doing the kind of in some cases it might be perfectly appropriate for an expert to testify, uh, about the nature of drug trafficking or, but that doesn't mean that the expert could testify about all matters in connection with drug trafficking without being qualified as to a particular matter. So testifying about how someone can make methamphetamine with, uh, items that can be purchased at the drug store or a hardware store doesn't te- doesn't qualify that person to testify about other matters in connection, uh, with the drug business unless the court makes a reliability determination. Otherwise, uh, the, uh, officers may just be testifying based on stereotypes attributable to people. Similarly, um, the, uh, in not allowing him to testify and not allowing me to cross-examine about the World Series ticket scandal. Well, maybe in other cases it was, it was proper to prohibit cross-examination of, uh, officers regarding that, but not in this case. The officer's credibility was key. And in my, uh, in my reply brief, I tried to, uh, explain why, uh, the admission of, uh, that, uh, while that would have been a cross-examination in this case, where in the Beck case, it might not have been cross-examination. I, uh, want to save a little time for rebuttal. Thank you. Thank you, Mr. Deaton. Mr. Reilly. May it please the court. Good morning. Uh, may it please co-counsel or counsel, opposing counsel in this case. I'll start with the first issue and, and raise them in the order as they were addressed by Mr. Deaton, if that, that pleases the court. As to the first issue, the admissibility of the co-conspirator statements, I just asked the court to keep in mind the, the bell-finding procedure that was undertaken in this case. Mr. Deaton engaged in aggressive and diligent motion practice in this case. Both the, he filed a motion challenging the admissibility of the anticipated co-conspirator statements, and those were the subject of a, uh, or they were at least raised by, by the witness himself when he testified at a pretrial motion hearing in relation to a identification. So everybody knew what the statements were going to be. We were in front of a very experienced district court judge. And as we do in any case, when we presented the proof in the case, we attempted to do so in a linear fashion, but also in anticipation of making a sufficient record for Judge Weber to make bell findings. So the court had heard substantial evidence of the existence of the conspiracy through five other witnesses who testified before Mr. Harris. That included an admitted co-conspirator, Marnina James, who testified among other things that Joseph Rander was a principal in the conspiracy and that the property at issue here at 5911 Highland was a drug distribution point for the Rander organization. Ms. James' credibility was established in part through multiple seizures in which she was implicated. One was a, a drug cocaine was seized in September of 2011. Then in August of 2012, she was caught in two separate incidents with, uh, both, both United States currency, $60,000 in California, and then transporting two kilos of, of cocaine from, uh, California to St. Louis. And she was caught in Albuquerque. So the court had heard that they'd also heard that, um, Leah Douglas testified. She was Casey Peebles' 20 year old girlfriend. Uh, he was 40 at the time. He was more sophisticated and he used, and when I say used, I mean, used her to hold his narcotics. They had an established drug trafficking relationship. She testified that Mr. Peebles who was on parole was a drug dealer and she held his narcotics for him. She was entirely aware that he was a drug dealer. So But, but that, that evidence doesn't include Peebles into the Rander conspiracy, correct? That's correct, Your Honor. So, so is it, I mean, it seems like the nub of the concern here for the defendant is that, all right, so, well, I'm not going to speak for them, but it seems to me that if you say, okay, there's a conspiracy, they've, they've proven up sufficient evidence of a conspiracy to, for the purposes of co-conspirator statements. But the only way you get Mr. Peebles in is through a co-conspirator statement of a conspiracy he may not be involved in. Thank you, Your Honor, if I may address that. So if proof of, of a formal agreement is unnecessary and an applied understanding is sufficient under Hellscher for, to prove the existence of a conspiracy and his involvement in it, let's look at the facts that we have absent Quante Harris's statements, which are the statements of Joseph Rander, uh, that he made to Quante Harris, both before and after the, the narcotics deal here. Let's look at the, the facts, uh, in terms of what's circumstantial. And, and when we look at Young, I'll cite Young for the, the proposition that's raised in our brief. And, uh, when we talk about independent evidence, Young at 771, independent evidence of a conspiracy or illicit association may be completely circumstantial, citing Martin. So let's cut the words out for a minute and look at the conduct. We have Casey Peebles showing up late in the late evening hours. He's driving his vehicle. Vernon Westcott and Leah Douglas are with him. The only person here who has any resources, any financial resources is Casey Peebles, uh, for all, all intents and purposes. Leah Douglas has to get clothes from Casey Peebles family and friends and, and Vernon Westcott doesn't even have a car. So Casey Peebles shows up at a drug house from, from there. Uh, that, that is something that supports the existence of a, of an agreement. He enters the drug house. He takes a quarter kilogram of, of cocaine. What we know are heroin. What we know later is a quarter kilo heroin, but Quante Harris also witnessed the drug transaction itself, setting aside the statements for a minute. He witnessed Joseph Rander deliver heroin to Peebles. Then almost immediately after they, he exits the residence and Peebles was the only person in the vehicle to enter the residence. That's unequivocally established from the, the record. So then he gets in his car, uh, Westcott's in the front seat. Douglas is in the backseat. They basically drive to the end of the block, make a right, and the police curb the vehicle. As officer Witzman approaches the vehicle, he sees movement and he sees Leah Douglas appearing. She's sitting in the backseat and she appears to be stuffing something into her pants, which she admitted when she testified. And was her testimony that those, that that bag that she stuffed in her pants was not in the car until after Peebles came? To, to her knowledge, your honor, the inferences to be raised were that, that Peebles walked into the residence. He was the only person to go in and then in accord with their she said, when we got pulled over, I knew what was going to happen. If there was drugs, it was coming to me because my job was to hold it. Essentially. That's not verbatim, but that's the essence of her testimony. So the, the inference that the jury found, your honor, was, was that he obtained the narcotics when he went into the residence and that was not in the vehicle before Peebles entered the residence. Then when they were pulled over, Douglas did not say that she saw Peebles hand the narcotics to Westcott, but she did see Westcott hand it to her. She, she put it in her, on her person. And then the female officer searched her and located the quarter kilogram of heroin. So judge Weber had heard all this evidence. And he also heard Quante Harris testified to the fact that Peebles delivered the strike that, that Rand or Joseph Rander delivered the heroin to Peebles before he ever made a ruling on the, on the Bell findings. Did Harris know how much it was? Harris didn't know how much it was. What Harris knew before the fact, your honor, what he, he told the police when he notified them, what brought them to watch these events and set up a surveillance was Harris's phone call that, that Joseph Rander, who I believe he referred to as breezy was at, at 5911 Highland. And he had a kilogram of heroin if he had it. And Harris had been working, is working with the officers through this. Harris is working with the officers. He's no longer a conspirator. He's no longer a conspirator. That's correct, your honor. But, and if I may, if I've answered that question, I would like to move on to why the statements aren't furtherance of the, of the conspiracy and the independent evidence of the existence of the, of the conspiracy. And, and so I guess in one respect, I say the obvious, he showed up at a, at a known drug house and a quarter kilogram of heroin was removed from a person who was in his vehicle, Leah Douglas, that's independent evidence. And as, as Mark and Young, that, that conspiracy case suggests it can be entirely circumstantial evidence of the, the independent evidence of the existence of the conspiracy. The officers watched Peoples enter the residence, exit the residence. Within moments, they conducted a car stop and discovered a quarter kilogram of heroin. And Leah Douglas testified her standard procedure that she, Peoples is a dope deal. She holds this dope for him because he says you're less likely to get searched. You're a woman. And then the police recover a quarter kilogram of heroin within moments of watching Peoples enter and exit the residence. So that's significant independent evidence of the existence of an implied agreement. And then in terms of the, the, so the street value is also 15 to $18,000. There is some kind of agreement there. Basic drug dealing tenants support that this is not a charity. If you take it, you either pay up front or you're going to pay later. That's, that's a reasonable inference for the jury to, to draw in terms of whether the statements. And there was, there was no exchange of money at that time. There's no evidence of that. Your honor. Mr. Harris testified. They didn't witness an exchange of money. And then when he came back up from letting Peoples out the door of 5911 Highland, that's when he stated Joseph Rand or said he, he fronted nine ounces of heroin. I'd like to touch on why both those statements, the ones before the deal and after the deal, including the nine ounces are in furtherance. Of course, when, when Mr. Joseph Rand or who's a conspirator tells Harris that somebody is coming over, he needs to work the door go down. He's coming and it's twins. People were fixing to be back on something to that effect. He's, he's facilitating a drug deal. He's, and he's also providing for the security of the conspiracy by having a doorman there to provide security. And he's, he's telling the doorman, it's okay to let this guy in. And let's talk about those statements for a moment after the, um, after the deal, nine ounces, I fronted nine ounces. Well, for one, one thing that does, it tells Quante Harris that there's still a quantity of heroin in the residence. It, we still have heroin. There was a kilogram. He took nine ounces. So he knows there's still something in the residence they need to protect and allows Joseph Rand or to continue to protect the heroin that remains in the residence. Uh, he also confirmed that the defendant people's for future dealings, he's in the conspiracy. I fronted them nine ounces. This deal went down. He's a part of the conspiracy. Now, the other thing it does, you can make a finding that, that it supports a, an accounting function for the, the conspiracy, the, the Randers motive to make statements doesn't end right there. This is an ongoing drug conspiracy is the five or six subsequent seizures that we introduced evidence of in the trial, all based on information from Quante Harris, by the way, those reflect the ongoing nature of the conspiracy. There's an accounting function. They, they, they have a kilogram of heroin. That's nine ounces. That guy has nine ounces, but you can find from that is he needs to pay us or, or it helps Joseph Rand or arguably keep track of who has what. So, so it furthers the conspiracy in multiple respects. Um, and in addition, I think, I think, uh, judge Erickson did touch on something that the relationship with twins people refers to some type of, of relationship, an existing relationship. You don't walk in and get nine ounces of heroin without having some kind of relationship. Harris testified. They didn't just let, let people in off the street. There's no evidence to support that somebody could just walk in and get nine ounces. Um, if I may, I'll address the other issues raised by Mr. Deaton, um, in terms of the, the expert, um, the, the testimony that was offered by the district court didn't abuse it's, it's discretion with regard to the last point, it's broad discretion and admitting the co-conspirator statements. Um, in addition, the district court did not use it's considerable discretion by allowing detective clay, a 28 year veteran who had, uh, engaged in hundreds of narcotics trafficking investigations, including undercover work and long-term investigations to testify to methods used by drug dealers. That's, that's not controversial in terms of the law of the eighth circuit. And his testimony was confined to the, um, the parameters of what's admissible under eighth circuit case law. In addition to that, in terms to the extent that, uh, Mr. Deaton challenges the record on the qualifications of, of detective clay, the record supports his qualifications. I also note the case we cited, uh, in our brief at page 48 homes, uh, that, that says with regard to drug profile experts, not necessarily Dalbert, doesn't necessarily apply, uh, to, to every aspect of their testimony. Except for profiling or was this sort of MO? It was MO your honor. If I said drug profiling, I apologize. It was modus operandi. Uh, it was, it was very standard testimony in terms of what's permissible under, under cases like, like, uh, I believe Robert Robertson, Kelly and Robertson that we've cited in our, our brief. Uh, there was nothing, there was nothing about this that was out of the realm of the ordinary in terms of explaining to a jury, giving them information to assist them in evaluating the way drug dealers operate. There's, these are things that, that regular jurors don't know. It's outside the scope of their knowledge and a qualified expert in this case, uh, testified, uh, to, to things that would assist the jury in understanding the evidence. And if I may, just to touch on briefly, I know my time's running out. The record again, I would say Mr. Deaton engaged in an aggressive motion practice. We disclosed the, the world series, uh, related discipline of two officers who testified in this case. And, uh, we're in front of a meticulous magistrate judge knows and a very experienced meticulous district judge, judge Weber, their findings on dockets, two 76 judge knows his RNR and judge Weber's memorandum adopting judge knows his RNR are very specific. They engaged in analysis, uh, is set forth by the circuit in the back case, which dealt with as judge Weber put it exactly the same issue. Uh, they found the probative value was virtually negligible. Uh, judge knows pointed out these events occur in almost nine years, uh, prior to the trial. And in addition, there judge knows also know there was no suggestion of systemic or repeated series of improper acts by the officers. Uh, so the, the actual decision itself is supported by Beck. And this was a Beck analysis. The judges did not abuse their discretion when they followed an eighth circuit opinion that as judge Weber put it and his, his memorandum in order, docket number two 87 raised the exactly the same issues presented in Beck. So there's no, no abuse of discretion there. And, uh, with that, I thank you unless there are any questions. I see none. Mr. Deaton, your rebuttal. Yes. Um, this isn't a case in which the defense is nitpicking, uh, the government's evidence. Uh, the defense presented its own evidence and including a canine officer who came in and testified about how a dog alerted, uh, to where, uh, uh, Leah Douglas was sitting in the passenger side of the car. If Leah Douglas's testimony had been, uh, truthful, that dog would have been, this was Casey people's car. The dog would have been alerting to the steering wheel in the front seat. Um, the abuse of discretion here, again, it's because even though certain kinds of evidence had been admitted in other cases that doesn't excuse the judge from not doing the analysis and, uh, of probative value and prejudice and those sorts of things to determine if, if the evidence should be admitted in this particular case. And as for the substance, the subsequent drug seizures, again, no evidence connecting, uh, Casey people's after April the second, my time is up. Thank you very much for your attention. Thank you, Mr. Deaton. And thank you for serving under the criminal justice act and representing your client.